In the Matter of FRANK LEOGRANDE, JR., Petitioner, *v.* STATE LIQUOR AUTHORITY OF THE STATE OF NEW YORK, Respondent.

First Department, March 31, 1966.

*Arnold E. Wallach* of counsel (*Fruchtman & Wallach,* attorneys), for petitioner.

*Joseph S. Ryan* of counsel (*Hyman Amsel,* attorney), for respondent.

BREITEL, J.   Petitioner's restaurant liquor license was cancelled by the State Liquor Authority and he brings this proceeding under article 78 of CPLR to review the determination. The evidence before the agency, if competent, was ample to substantiate the charges that the licensee engaged on and off

the licensed premises in professional gambling activities, namely, bookmaking and policy collections. Petitioner contends, however, that the evidence establishing the charges was not competent because such evidence was the product of illegal search and seizure by police officers. The police officers, testifying in this administrative proceeding, had acted under two search warrants in collateral criminal proceedings, in which the warrants were subsequently vacated for lack of probable cause. Petitioner argues that the evidence other than that tainted by illegality is insufficient to sustain the charges.

The cancellation of the license should be annulled and the license restored. It is concluded that the exclusionary rule barring the use of evidence obtained by illegal search and seizure by public officials extends to any official proceeding brought to impose official forfeitures, penalties, or similar sanctions for violations of law or regulation. It is noted, however, that the precise issue is not one that has been passed upon by the Court of Appeals, and rarely, if ever, by the highest courts in other jurisdictions.

The two search warrants were based on observations by police officers made from the street. As background, perhaps to explain the occasion for the police observations, it is notable that the licensee had been once before suspended by the agency for suffering gambling on the licensed premises.

On November 26, 1963, police officer Smyth observed the licensee being approached immediately outside the licensed premises by four persons unknown to the police, each of whom engaged the licensee in conversation and handed him money. Officer Smyth heard the fourth man say to the licensee: "Give me the five for a dollar."

On November 29 officer Smyth obtained a search warrant, entered the licensed premises with another police officer, made a search, and obtained from the licensee's person a slip of paper bearing evident gambling notations. From the table in the kitchen area of the licensed premises officer Smyth obtained a slip bearing 14 plays of "single action of mutual [sic]race operation" and the "identities" of collectors, a quantity of other gambling papers, and two racing programs of current date. According to officer Smyth, the licensee admitted to him that all the gambling papers were his "action." While there the officer answered the telephone on a number of occasions and the persons at the other end attempted to place bets. At the time of the search by officer Smyth, his partner (officer Segarra) remained at the bar where one Fay Ettinger approached him. She gave him a list of bets, containing 65 plays of mutuel race

horse policy, single action and bolita, to deliver to the licensee and, after being arrested, told him that she had been taking policy bets for about two weeks and turning the numbers in to the licensee. Thereafter, in criminal proceedings brought against the licensee, the search warrant was controverted, the evidence obtained by it ruled inadmissible, and the criminal charges were dismissed.

The second search followed a somewhat similar course. On March 11 and 12, 1964, police officer Morgan observed one McHugh, outside the licensed premises, being approached by some 20 persons who engaged McHugh in conversations, handing him moneys, and McHugh making notations on paper. On both dates McHugh was later observed by officer Morgan turning over the papers and moneys to the licensee who was seated in his automobile outside the licensed premises.

After officer Morgan had obtained a search warrant based on the observations last described and on additional information, he returned to the neighborhood on March 19 and observed McHugh operating in similar fashion but this time delivering money and papers to the licensee inside the licensed premises. The observation was made through the front window of the bar. Upon executing the search warrant officer Morgan removed from the person of the licensee, as the latter was entering his automobile, a number of papers bearing wagers on horse races and $259 in money. In criminal proceedings brought against the licensee and McHugh this search warrant was also controverted, vacated for lack of probable cause, and the criminal proceedings dismissed.

The licensee, testifying in this proceeding, denied the circumstances of the street observations and all of the material incriminating elements connected with the searches and seizures under the warrants. Despite these denials, this Court is bound to accept the police version on the assumption that the agency's findings so concluded on the evidence (*Matter of Radigan* v. *O'Connell,* 304 N. Y. 396, 399).

It is evident that the police officers in entering the licensee's premises on the first search did so pursuant to a search warrant and not, as the agency now argues, in the exercise of any supervisory power over licensed premises authorized by subdivision 15 of section 106 of the Alcoholic Beverage Control Law. Moreover, the intrusive nature of the search of the premises and of the licensee's person was not consistent with a statutory supervisory inspection, but was explainable only as a police search in enforcement of the criminal laws. The second search, of course, did not occur inside the licensed premises.

The warrants having been vacated for insufficiency of probable cause, any evidence obtained through their execution was illegally obtained in violation of the Fourth Amendment of the Federal Constitution and section 12 of article I of the State Constitution. The effect under the exclusionary rule is that the incriminating papers which established the policy collecting and bookmaking activities of the licensee were not admissible in any criminal proceeding (*People* v. *Rainey,* 14 N Y 2d 35, 38–39; *People* v. *Fino,* 14 N Y 2d 160, 163–164).

Insofar as the conversations over the telephone with persons unknown to the police, intercepted by officer Smyth while executing one of the vacated search warrants, these, too, are subject to the search and seizure restrictions in the Constitution (*Wong Sun* v. *United States,* 371 U. S. 471, 485–488; *People* v. *Rodriguez,* 11 N Y 2d 279, 286). Generally, the interception of telephone calls in the course of a legal police search of another's premises is not prohibited by the constitutional restrictions (e.g., *United States* v. *Pasha,* 332 F. 2d 193, 196–198, cert. den., 379 U. S. 839; see, also, Anno.: Telephone Calls — Admissibility, 13 ALR 2d 1409, esp. cases cited pp. 1414–1419). However, the interceptions in question were not made during a lawful search and therefore they fall under the same prohibition applicable to the general search.

The conversations between officer Segarra, who was officer Smyth's partner in the first search, and the woman, Fay Ettinger, took place while officer Segarra was at the bar of the licensed premises and, arguably, occurred while that officer was not actually executing the warrant subsequently determined to be illegal. But, the conversations with the woman cannot be linked with the licensee unless the context of her remarks is accepted as true. It is not legally possible to accept the content of her remarks as true, as distinguished from the fact of their occurrence, without violating the hearsay rule (Richardson, Evidence [9th ed.], §§ 206–209, and cases cited). It is well established in this State that while hearsay evidence is admissible in an administrative proceeding there must be some legal or competent evidence to sustain the determination (e.g., *Matter of Stammer* v. *Board of Regents,* 287 N. Y. 359, 365; 1 N. Y. Jur., Administrative Law, §§ 141, 201).

All that then remains by way of competent evidence to establish the misconduct of the licensee on and off the licensed premises are the observations of the licensee and McHugh engaging in conversations with one another and with persons unknown to the police, the exchange of moneys and the making of notations on paper, with the additional overheard comment

of one of the unknown men to the effect, " Give me the five for a dollar.'' The conduct observed was highly suspicious but not relatable to any criminal or disorderly activity (e.g., *People* v. *Fino,* 14 N Y 2d 160, 163, *supra; People* v. *Moore,* 11 N Y 2d 271). In considering this evidence there is no requirement in this civil proceeding that the proof meet as high a standard as that required in a criminal proceeding (*Matter of Katz's Delicatessen* v. *O'Connell,* 302 N. Y. 286, 288; *Matter of Schnitzler* v. *Casey,* 283 App. Div. 1092, and cases cited). Thus the evidence need not establish culpability beyond a reasonable doubt. Nevertheless, as a matter of logical proof and minimal standards of probability, merely suspicious conduct which might cause one quite properly to inquire further is not sufficient to establish misconduct.[1] The evidence in this case might be tested by considering whether in a proceeding by the licensee's landlord to evict the tenant as objectionable the police observations without more would suffice to justify an eviction of the licensee as an objectionable tenant. It would not suffice. There are many lawful activities which involve persons exchanging money and making written notations with respect to the transactions the moneys represent (cf. *People* v. *Moore,* 11 N Y 2d 271, *supra*). In this case, without the gambling papers, culpability for misconduct is not made out.

The only question remaining is whether the exclusionary rule applicable to criminal proceedings and involving illegally obtained evidence extends to a proceeding of this character. The Court of Appeals has held that the exclusionary rule does not apply to a civil action between private persons involving the private but illegal seizure of evidence (*Sackler* v. *Sackler,* 15 N Y 2d 40). It had, theretofore, reserved the question whether the exclusionary rule extends to civil proceedings instituted by public officials in which evidence illegally obtained by public officials is tendered (*People* v. *Laverne,* 14 N Y 2d 304, 308).

The *Laverne* case, a criminal action, involved suppression of observations made by a building inspector who entered a building against the wishes of its occupant but pursuant to a village ordinance authorizing entry at any reasonable hour. His observations were received as evidence in three criminal prosecutions brought to punish violations of another village ordinance making it a criminal offense to conduct a business in a non-business zone.

1. See, however, *People* v. *Valentine* (17 N Y 2d 128), in which such proof was held sufficient only to provide probable cause for an arrest without a warrant.

The exclusionary rule was held applicable by the Court of Appeals in reversing the criminal convictions. Citing *Frank* v. *Maryland* (359 U. S. 360, rehearing den., 360 U. S. 914) and *Eaton* v. *Price* (364 U. S. 263), the Court of Appeals distinguished as inapplicable intrusions required for urgent administrative or summary action to preserve health or public safety.

Following the Court of Appeals' decision in the *Laverne* case, the Appellate Division, Second Department, excluded the same evidence in two proceedings, arising out of the same complex, where the municipality sought in the one to recover a civil penalty and in the other to punish for contempt (*Incorporated Vil. of Laurel Hollow* v. *Laverne, Inc.*, 24 A D 2d 615; *Incorporated Vil. of Laurel Hollow* v. *Laverne Originals, Inc.*, 24 A D 2d 616, app. dsmd., 16 N Y 2d 866). In doing so, the Appellate Division tersely characterized both proceedings as quasi-criminal in nature.

The question left unanswered by the Court of Appeals has been explored subsequently in commentaries (e.g., Case Comment, 50 Cornell L. Q. 282; Case Note, 49 Minn. L. Rev. 319). It has also been touched upon in a Federal case involving property forfeiture (*One 1958 Plymouth Sedan* v. *Pennsylvania,* 380 U. S. 693). In the *1958 Plymouth Sedan* case the United States Supreme Court quoted with approval language from the case of *Boyd* v. *United States* (116 U. S. 616), where, in refusing to accept the classification of civil, as opposed to criminal, in characterizing forfeiture proceedings for the purposes of applying the Fourth Amendment, it was said (116 U. S. at p. 634): '' If the government prosecutor elects to waive an indictment, and to file a civil information against the claimants — that is, civil in form — can he by this device take from the proceeding its criminal aspect and deprive the claimants of their immunities as citizens, and extort from them a production of their private papers, or, as an alternative, a confession of guilt? This cannot be. The information, though technically a civil proceeding, is in substance and effect a criminal one * * * As, therefore, suits for penalties and forfeitures incurred by the commission of offences against the law, are of this quasi-criminal nature, we think that they are within the reason of criminal proceedings for all the purposes of the Fourth Amendment of the Constitution * * *.''

All of the reasons in policy which suggest the application of the exclusionary rule to illegal searches and seizures by public officers in criminal proceedings apply equally to administrative proceedings of the present character, namely those involving

penalties, forfeitures, or other sanctions for the violation of law or regulation.[2] The exception mentioned in the *Laverne* case has an understandable basis in protecting against immediate dangers to public life and health. The exclusionary rule is addressed to the obnoxiousness of illegal conduct by public officials and the visiting by officials of serious official consequences upon the victims of such illegal conduct. In this case the illegal activity of the police officers was equally obnoxious and has official consequences more grave in economic terms than those of the criminal sanctions for gambling. The licensee, as noted earlier, is subject to loss of his valuable liquor license and to forfeiture of "the penal sum" of $1,000 on the bond supplied to the administrative agency in connection with his license. The exclusionary rule rests on a theory of deterrence; that policy would not be served if the illegal official activity could be used, despite unavailability in criminal proceedings, to effect parallel sanctions of forfeiture in an administrative proceeding.

On this view, the police street observations in this case are not sufficient and the results of the police searches are not available to sustain the present administrative determination resulting as it does in the forfeiture of a valuable license and a penal sum. There being no other competent evidence to sustain the charges of misconduct against the licensee, the determination must be overturned, because the police observations and searches and the licensee's prior history establish the charges only in truth, but not in law.

Accordingly, the determination of the State Liquor Authority canceling the restaurant liquor license of petitioner under date of January 28, 1965 should be annulled, on the law, without costs or disbursements to either party.

EAGER, J. (dissenting). I would confirm the determination of the respondent, State Liquor Authority, insofar as it cancels the restaurant liquor license of the petitioner. Neither constitutional mandate nor statutory provision precludes the Authority from considering the proofs obtained as a result of the searches and seizures conducted by police officers and referred to in the majority opinion; and public policy considerations fully support the Authority's action in receiving such proofs in the proceeding before it.

Even if we assume that the searches and seizures by the police officers were not properly authorized (although I am of the

---

2. Thus, for example, now irrelevant and not now passed upon is the application of the exclusionary rule to subsequent and independent applications for licenses, positions in the public service, and the like.

opinion that the Authority was entitled to find otherwise for the purpose of license cancellation proceeding — See Alcoholic Beverage Control Law, § 17, subd. 7; § 106, subd. 15; *State of New Jersey* v. *Zurawski,* 89 N. J. Super. 488, affd. —— A. 2d —— [May 9, 1966]), nevertheless, the Authority was entitled to receive the evidence secured by the police officers. Absent statutory proscription against the receipt by the Authority of such evidence, the validity of the licensee's objection to the use of the evidence depends upon the effect to be given the constitutional interdiction against unreasonable searches and seizures.

In New York, immunity from search and seizure was long considered as " the creature, not of constitution but of statute "; and, until 1938, there was no immunity except as prescribed by statute. (*People* v. *Defore,* 242 N. Y. 13, 25.) As recommended by the New York State Constitutional Convention of 1938, the statutory restraint against unreasonable searches and seizures was incorporated into the State Constitution but the Convention rejected proposals to adopt an exclusionary rule in New York. (N. Y. Const., art. I, § 12; *People* v. *Richter's Jewelers,* 291 N. Y. 161; *People* v. *La Combe,* 170 Misc. 669.) Until the decision of the United States Supreme Court in 1961 in *Mapp* v. *Ohio* (367 U. S. 643), it was held here that the constitutional restraints, including that of the Fourth Amendment (U. S. Const.) against searches and seizures would not be given the effect of barring the use in our State courts of evidence procured as a result of an unlawful search and seizure. The evidence so procured was generally held admissible in all criminal and civil proceedings. (See *People* v. *Defore, supra; People* v. *Adams,* 176 N. Y. 351, affd. 192 U. S. 585; *People* v. *Richter's Jewelers, supra; Sackler* v. *Sackler,* 15 N Y 2d 40; *People* v. *La Combe, supra.*) The United States Supreme Court, however, in *Mapp* v. *Ohio* (*supra*), reasoned and decided that henceforth the due process clause (14th Amdt.) would be given the effect of precluding State action tending to contravene the Fourth Amendment. " The core of the Fourth Amendment prohibiting unreasonable searches applies to the States through the Due Process Clause of the Fourteenth Amendment. *Wolf* v. *Colorado,* 338 U. S. 25 ". (*Frank* v. *Maryland,* 359 U. S. 360, 373 [concurring opn. of Whittaker, J.]) Under the *Mapp* doctrine, the evidentiary use by the Authority of the product of an illegal search and seizure would be constitutionally prohibitive only if such use tended to deprive the licensee of property without due process of law.

The license of the petitioner, however, as in the case of all licenses issued under the Alcoholic Beverage Control Law, was

issued subject to "a statement in substance that such license shall not be deemed a property or vested right, and that it may be revoked at any time pursuant to law." (Alcoholic Beverage Control Law, § 114, subd 4, par. [d].) The liquor license is not a right but a privilege (*Matter of Katz's Delicatessen* v. *O'Connell*, 302 N. Y. 286, 288, 289), and a license conferring upon the licensee the privilege to sell intoxicating liquors is not in any sense "property" within the protection of the due process clause. (2 N. Y. Jur., Alcoholic Beverages, § 21, p. 531; 35 N. Y. Jur., Licenses, § 1; *Tracy* v. *Ginsberg,* 205 U. S. 170; *Matter of Yates* v. *Mulrooney,* 245 App. Div. 146; *Tokaji* v. *State Bd. of Equalization,* 20 Cal. App. 2d 612.) Thus, in a proceeding for cancellation of a license, there exists no constitutional restriction precluding the consideration by the Authority of the proofs uncovered by the officers.

The vacatur of the search warrants for lack of probable cause and the suppression of evidence obtained in the alleged searches and seizures was effective merely to preclude the use of the evidence "in any criminal proceeding". This is the extent of the statutory proscription and the holding of the decisions. (Code Crim. Pro., § 813-c; *People* v. *Rainey,* 14 N Y 2d 35; *People* v. *Fino,* 14 N Y 2d 160.) The proceeding before the Authority for the cancellation of a liquor license, although a quasi-judicial proceeding, is not criminal or quasi-criminal in nature. Insofar as the proceeding sought to recall or terminate the licensee's privilege to sell liquors, it may not be properly classified as one to impose a penalty or a forfeiture. If, additionally to the cancellation of the license and, as here, the Authority also determines that it shall make and enforce a claim upon the licensee's bond, such claim is enforcible by independent suit, civil in nature, to be maintained in a court of competent jurisdiction (see Alcoholic Beverage Control Law, § 112).

In any event, the Authority was not a party to the proceedings controverting the search warrants and it is not bound by the determinations vacating the warrants and suppressing the evidence. Irrespective of the validity of the warrants, the Authority had the right to determine for itself whether or not the searches and seizures were unreasonable and without probable cause. Constitutional immunity is granted not from all searches and seizures, but only from such as are "unreasonable". (U. S. Const., 4th Amdt.; N. Y. Const., art. I; 79 C. J. S., Searches and Seizures, § 8, p. 786; *People* v. *Richter's Jewelers,* 265 App. Div. 767, 771, affd. 291 N. Y. 161, *supra*; *Burke* v. *Kingsley Books,* 208 Misc. 150, 169, affd. 1 N Y 2d 177, affd. 354 U. S. 436.) "The constitutional guaranties against unreasonable searches and

seizures are intended for the protection of private rights only, and do not interfere with investigations into matters of a public or quasi-public nature or in which the public has an interest." (4 Wharton's Criminal Law and Procedure, Search and Seizure, § 1531, p. 135.) I would hold that the record here was not lacking in substantial evidence supporting a determination by the Authority that the actions of the police officers were fully justifiable at least as the basis for the cancellation by the Authority of the petitioner's license.

Finally, the interests of justice and public policy of the State will be circumvented by a denial of the right of the Authority to use the evidence peaceably obtained by the officers in the performance of their duties. As clearly revealed by the long line of decisions, the rejection by the Constitutional Convention of 1938 of proposals to change the New York exclusionary rule and the lack of action by the Legislature in the matter, the public policy of this State is not to expand the exclusionary rule beyond that required in the interests of due process and in the interests of justice. (See *People* v. *Defore,* 242 N. Y. 13, 23, *supra*; *People* v. *Richter's Jewelers,* 291 N. Y. 161, 168, *supra*.) "The interests of justice will not be promoted by the announcement by the courts of new exclusions, since the process of investigating the truth in courts of justice is an indispensable function of society and since 'judicial rules of evidence were never meant to be used as an indirect method of punishment' of trespassers and other lawless intruders (8 Wigmore, Evidence [McNaughton rev.], § 2183; *Commonwealth* v. *Dana,* 2 Met. [43 Mass.] 329 [1841])." (*Sackler* v. *Sackler,* 15 N Y 2d 40, 44, *supra*.)

"Application of the broad restraints of due process compels inquiry into the nature of the demand being made upon individual freedom in a particular context and the justification of social need on which the demand rests." (*Frank* v. *Maryland,* 359 U. S. 360, 363, *supra*.) The inquiry here by the Authority and its utilization of the particular proofs, was justified in furtherance of the public interest for the protection of the health, welfare and safety of the people of the State. (See Alcoholic Beverage Control Law, § 2.) It is well known that the liquor traffic, when placed in the hands of an irresponsible licensee, is fraught with danger to the public. So, policy requirements, flowing from the public interest which is of paramount importance, should preclude a licensee, guilty of illegality, from claiming the benefit of the exclusionary rule for the purpose of continuing to exercise a privilege which should be cancelled in the public interest.

236

To render the police searches here unavailable to the Authority not only clashes with the long-established public policy of this State but also constitutes an undue interference with the broad discretionary powers intended to be vested in the Authority for the public good.

BOTEIN, P. J., RABIN and BASTOW, JJ., concur with BREITEL, J.; EAGER, J., dissents in opinion.

Determination annulled, on the law, without costs or disbursements to either party.